IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | 10-751 |
| | : | |
| RODNEY WESLEY FRIERSON and | : | |
| ANGEL LEDUANN ANDERSON | : | |
| | : | |

Goldberg, J.                                                                                            August 30, 2011

### MEMORANDUM OPINION

Defendants Rodney Frierson and Angel Anderson have been charged with conspiracy to possess with the intent to distribute, and possession with intent to distribute, 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841 and 846. Frierson is also charged with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and being a felon in possession of a firearm in violation of 18 U.S.C. 922(g). These charges stem from the stop and eventual search of a rental vehicle by the Pennsylvania State Police.

Presently before the Court are Defendants' motions to suppress physical evidence and statements premised upon Fourth Amendment violations. Although determination as to whether the Defendants' constitutional rights were violated is a close decision, for reasons stated herein, we will deny Defendants' motions.[1]

**I.    PROCEDURAL AND FACTUAL BACKGROUND**

An evidentiary hearing on Defendants' motions was held on May 20, 2011, where the

---

[1] On August 11, 2011, we issued an order denying Defendants' motions. We offer this Opinion to explain the basis for that ruling.

1

Government presented the testimony of Pennsylvania State Troopers Justin Hope and Luke Straniere. This testimony, along with the Trooper Hope's video recording of the traffic stop, established the following:

Trooper Hope is an Intelligence Officer assigned to disrupt the flow of illegal drug and contraband traffic along the Pennsylvania Turnpike. He has extensive training and experience in the interdiction of individuals engaged in the transportation of drugs in passenger and commercial vehicles.[2]

On the morning of January 15, 2010, Hope was positioned at the Valley Forge entrance ramp to the westbound side of the Pennsylvania Turnpike. He was in police uniform inside an unmarked vehicle facing the on-ramp, in view of westbound traffic entering the Turnpike. Shortly after 10:30 a.m., Hope observed two men in a black Chevrolet Tahoe Sports Utility Vehicle (SUV) with an Ohio license plate entering the Turnpike. He also observed a bar code on the vehicle indicating that the SUV was likely a rental and indeed, Hope confirmed that the vehicle was rented through Enterprise Rental Car Agency. (Supp. Hr'g Tr. 22 - 29.)

Hope testified that he became suspicious that the individuals in the SUV might be trafficking drugs because: (1) the driver did not look at him when he passed even though Hope had looked directly at the driver, and it was common for drivers to look at him when his car was parked in the position it was in; (2) the driver's hands were in the "10-and-2 position" on the steering wheel, which Hope explained is intended to convey safe driving to a police officer and is contrary to the

---

[2] Hope's experience in investigating drug and firearm crimes includes nine years as a State Trooper; numerous traffic stops, which have involved large amounts of narcotics and firearms; extensive training in the area of "passenger motor vehicles and commercial motor vehicles involving large amounts of illegal drugs . . . ," and the driving behaviors of persons transporting drugs and/or guns. (Supp. Hr'g Tr. 11-21.)

driving habits of most drivers; (3) two people were in the vehicle, which is common amongst drug traffickers transporting narcotics; (4) it was mid-Friday morning, which was significant because the majority of the public works during that time period; (5) an SUV was being driven, which is the most common vehicle used to transport large amounts of drugs; (6) the SUV was an out-of-state rental vehicle, and rental vehicles are often used by drug traffickers; and (7) the SUV was being driven from Philadelphia, a source city for illegal narcotics. (Supp. Hr'g Tr. 25-31.)  While we credit Hope's training and experience regarding the meaning of these observations, we also note that many, if not all, of these factors could be consistent with non-criminal activity.

Hope followed the SUV, clocking it for approximately one mile traveling at 76 mph in a 65 mph zone in violation of the Pennsylvania Motor Vehicle Code.  At 10:44 a.m., having observed a violation of the vehicle code, Hope activated his vehicle lights whereupon the SUV immediately pulled over.[3]  Hope approached the vehicle, introduced himself, and asked the driver, Defendant Rodney Frierson, for his drivers license and registration.  Frierson produced a California drivers license and an Enterprise rental agreement.  Hope testified that California is a source area for obtaining illegal drugs, mostly from Mexico. The passenger, Defendant Angel Anderson, stated that he had rented the car and volunteered his license, which was also from California. (Supp. Hr'g Tr. 31-32, 35, 38-39.)

Within seconds of receiving Defendants' licenses and the rental agreement, Anderson volunteered to Hope that his girlfriend was a Philadelphia police officer.  Hope explained that, based on his training and experience, providing such information constitutes a "disclaimer," which is

---

[3] The entire stop was recorded by a camera positioned on the dashboard of Hope's vehicle.

intended to suggest that the person would not be involved in criminal activity. Hope also observed three cell phones in the center console of the SUV, and testified that this created further suspicion because it is common for drug traffickers to have multiple cell phones. Hope informed Frierson and Anderson that he stopped them for speeding and intended to issue a warning. (Supp. Hr'g Tr. 41-45.)

In evaluating all of the suspicious factors known to him at this point, Hope explained that while any one factor could be viewed as innocent or suspicious, his training and experience dictated that such factors should be considered together. Hope testified that when he began to view all of the factors available to him at that point together, he started to believe illegal activity was afoot. (Supp. Hr'g Tr. 44)

Hope returned to his car, ran both drivers' licenses and found that both were valid. He also learned that no outstanding warrants existed for either occupant and neither were on probation or parole. Anderson had no criminal history, however, Frierson had an "extensive serious criminal history" in California. This criminal history included a 1996 juvenile conviction for voluntary manslaughter for which Frierson served five years in a juvenile facility. Frierson had also been charged with felony possession of an assault weapon and possession of body armor in 2005. Frierson was convicted of the firearm charge and served sixteen months while the body armor charge was dismissed. In 2006, after being released for the firearms conviction, Frierson was convicted for possession, transport or sale of cocaine for which he served thirty-six months. Hope testified that Frierson's record made him concerned for his safety and further confirmed his suspicion that criminal activity was occurring inside the vehicle. (Supp. Hr'g Tr. 45-52; Govt. Ex. B.)

During this time, Hope was in contact with his backup, Trooper Luke Straniere, who was involved in making a separate stop on the Turnpike. Hope requested that Straniere join him when

he finished with his traffic stop. Hope also called other troopers for backup and attempted to determine the availability of a K-9 dog sniffing unit. (Supp. Hr'g Tr. 52-54.)

At approximately 11:02 a.m., Hope had a radio conversation with an unidentified individual advising that he had stopped a vehicle for speeding, that the passenger had said his girlfriend was a Philadelphia cop and that the driver had murder and felony possession of cocaine convictions on his rap sheet. Hope noted, "that's all I got so far. It's not a third party rental so I'm going to have to get more reasonable suspicion but I figured I'd call you at least for now." (Video, 11:02 a.m.)

Hope further testified that he made an inquiry with the El Paso Intelligence Center in Texas (EPIC) to determine if either Frierson or Anderson had crossed the United States/Mexican border. EPIC reported that Frierson had crossed into Mexico from California four times in 2009. Hope was aware that Mexico is a source country for drugs coming into the United States. (Supp. Hr'g Tr. 54-55.)

In addition to reviewing the drivers' licenses and criminal histories, Hope also reviewed the rental agreement, which indicated that the vehicle was rented by the passenger, Anderson, and that Frierson was not authorized to drive the vehicle. Additionally, the rental agreement expired on January 7, 2010. (Supp. Hr'g Tr. 55-56.)

At 11:10 a.m., Trooper Straniere arrived. At that time, Hope approached the SUV to ask Defendants about the status of the rental agreement. Anderson explained that the agreement had been extended and Frierson acknowledged that he was not an authorized driver under the agreement. Hope then told Frierson that because he was not an authorized driver, Anderson was going to have to drive. (Supp. Hr'g Tr. 56-88.)

After questioning Frierson and Anderson about the agreement, Hope and Straniere got into

the back seat of Hope's police vehicle, wherein Hope explained what he had learned up to that point. At approximately 11:14 a.m., Straniere called Enterprise concerning the status of the rental and was advised that the agreement had been extended through January 21, 2010. Straniere also learned that Anderson had rented vehicles from Enterprise five times in the previous four months. Hope explained that the use of multiple rental vehicles is consistent with the transport of illegal drugs. (Supp. Hr'g Tr. 61-62.)

The troopers then discussed a plan to approach the SUV, remove the parties, ask them questions about their travel itinerary, and give Frierson a written warning. At 11:23 a.m, thirty-nine minutes after the vehicle was stopped, Straniere approached the passenger side of the SUV to engage Anderson in conversation while Hope approached the driver's side and asked Frierson to exit the car. Frierson complied with the order and when he exited, Hope observed that he was in a long-sleeve black shirt which was not tucked in, and which extended below his waistline. Hope asked Frierson if he could pat him down, and Frierson declined. Hope asked several more times if he could pat Frierson down, explaining that he wanted to do so for his safety and that another trooper had recently been shot in a similar situation. Frierson again refused. Hope testified this was the first time out of hundreds of traffic stops that anyone had refused to be patted down. When Hope asked Frierson if he had ever been arrested, Frierson responded that it "was neither here nor there" and asked that he be given his ticket so he could leave. (Video; Supp. Hr'g Tr. 64-70.)

Hope testified that he was "mad and frustrated" and asked Straniere to assist him. When Straniere asked Frierson if he could pat him down, Frierson also refused this request. Frierson was then instructed to place both arms on the police car. Hope testified that as he patted down Frierson's left side, Straniere patted down Frierson's right side and "confirmed that there was a gun on his right

6

side." A struggle ensued between Straniere and Frierson as Straniere attempted to take Frierson to the ground. At that point, Frierson's shirt came up and Hope observed a gun handle in Frierson's waistband. (Supp. Hr'g Tr. 69-72.)

Regarding the pat down, Straniere testified as follows:

Q. And then what happened.

A. As is our policy for patting people down, just – he had a long T-shirt on and I felt his waistband. I felt something immediately on his right that was hard. As I began to lift up his shirt to recognize what it was, I immediately saw it as the handle of a handgun. In this case, I took Mr. Frierson to the ground and attempted to put handcuffs on him.

Q. And what happened? Did you end up taking the handgun?

A. Trooper Hope – in the process of going to the ground, Trooper Hope retrieved the vehicle – I'm sorry, retrieved the gun and placed it inside his vehicle for securement.

Q. And when you placed the handcuffs on Mr. Frierson was he under arrest?

A. Yes.

(Supp. Hr'g Tr. 136.)

During the suppression hearing, it was established that Straniere's police report documenting the pat down reads: "I was on his right side and felt the right side of his waistband. As I lifted his shirt, I felt a hard object on his right hip. I immediately recognized it as a handgun." On cross-examination, Straniere testified that his report was accurate. (Supp. Hr'g Tr. 145.) On redirect, the Government asked Straniere:

Q. Did you - - you earlier testified on direct that you patted him down - - I mean you patted him, felt a bulge, lifted the shirt and then saw the butt of a firearm.

A. That's correct.

> Q.     Is that what happened or did you lift the shirt first, see the firearm - -
>
> A.     No I felt it first. I felt the exterior and - -
>
> . . .
>
> THE WITNESS: I patted first. (Supp. Hr'g Tr. 153-54.)

Hoping to obtain further clarification on his report, the Court asked Straniere, "It says 'I was on his right side and felt the right side of his waistband.' By that sentence, is that written to indicate that that was the pat down? That sentence?" Straniere responded "yes."[4] (Supp. Hr'g Tr. 155.)

Our review of the suppression record reflects that Straniere's report does in fact state "As I lifted his shirt, I felt a hard object," which could reflect that a search of Frierson's person occurred before the pat down. However, the sentence before that reads "I was on his right side and felt the right side of his waistband," which we find is consistent with the pat down occurring first. Having carefully considered Straniere's testimony, his report, and having observed his demeanor under cross-examination, we will credit Straniere's testimony that he first patted Frierson's waistband and felt the gun prior to lifting his shirt.

After Frierson was taken to the ground, Hope seized a .45 caliber handgun from his waistband. Because Frierson has a felony conviction, he was arrested for being a felon in possession and was placed in Straniere's police vehicle. (Supp. Hr'g Tr. 75-76.)

Anderson was then directed out of the car, ordered to lay on the ground, placed in handcuffs, patted down for weapons, and placed in a separate police vehicle. He was not formally arrested at that time. Frierson and Anderson were transported back to the State Police barracks where the SUV

---

[4] Straniere's testimony became a bit muddled when Frierson's counsel then asked him: "Are you saying today that when you wrote in your report, as I lifted his shirt, that you didn't mean that?" Straniere responded: "Yes, I meant that." (Supp. Hr'g Tr. p. 158.)

was later transported. (Supp. Hr'g Tr. 76-78.)

At the barracks, Anderson was shackled in an interrogation room. At 12:36 p.m., although still not charged, Anderson was given his Miranda rights and signed a statement indicating that he was advised of his right to remain silent and still wished to speak with the troopers. Amongst other things, Anderson told the troopers that there was only one bag in the vehicle, which was in the rear storage area. Anderson said it was his bag but that Frierson had some of his belongings in the bag as well. (Supp. Hr'g Tr. 80-84.)

Anderson was also told he could provide the troopers with consent to search the SUV but he did not have to do so. Anderson gave the troopers consent to search the SUV by signing a State Police "Waiver of Rights and Consent to Search" form.[5] (Supp. Hr'g Tr. 86.) At 2:00 p.m., the troopers searched the SUV and found what was later determined to be approximately 995 grams of cocaine, a vacuum sealer, and five rolls of plastic vacuum sealed bags in a luggage bag that was in the rear storage area of the vehicle. (Supp. Hr'g Tr. 87-88.)

Frierson and Anderson were charged with state law violations in the Court of Common Pleas of Chester County. Following a hearing on their motions to suppress, the Honorable Ronald C. Nagle denied Frierson's motion to suppress the firearm but granted both Defendants' motions to suppress the cocaine and Anderson's statements. Judge Nagle found that Anderson's waiver of his Miranda rights and consent to search were invalid because he was subject to arrest unsupported by probable cause. (Memorandum Opinion and Order, Sept. 22, 2010).

Defendants were then charged by way of Federal Criminal Complaint on Nov. 9, 2010, and

---

[5] Defendants note that Anderson did not sign a specific consent to search the bag in the SUV.

both were subsequently indicted. The charges filed in Chester County were subsequently dismissed.

## II. LEGAL ANALYSIS

Frierson raises several reasons why the firearm obtained from his person and from the SUV should be suppressed. He claims that: the duration of the traffic stop was excessive, rendering it illegal; the troopers lacked reasonable suspicion to pat him down; the pat down itself exceeded the scope of a Terry pat down; Anderson's arrest was illegal; Anderson's consent to search the vehicle was involuntary; and the troopers search of the SUV exceeded the scope of Anderson's consent.

Anderson also raises numerous reasons to suppress evidence asserting that: the duration of the traffic stop was excessive, rendering the stop illegal; the troopers had no basis to continue to detain him after Frierson's arrest; he was illegally arrested by the troopers, rendering his consent to search the SUV invalid; if valid, his consent to search the SUV did not extend to the search of the gym bag; and his statements to the troopers were involuntary.

"The Fourth Amendment prohibits unreasonable searches and seizures, and searches without a warrant are presumptively unreasonable." United States v. Mathurin, 561 F.3d 170, 173 (3d Cir.2009) (citing U.S. Const. amend. IV; Horton v. California, 110 S.Ct. 2301, 2305-06 (1990)). "However, under the exception to the warrant requirement established in Terry v. Ohio, 88 S.Ct. 1868 (1968), the Supreme Court has held that 'police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.'" Id. at 173-74 (quoting United States v. Sokolow, 109 S.Ct. 1581, 1585 (1989) (internal quotations omitted)). "Any evidence obtained pursuant to an investigatory stop (also known as a 'Terry stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" United

10

States v. Brown, 448 F.3d 239, 244 (3d Cir.2006) (citing Wong Sun v. United States, 83 S.Ct. 407, 417 (1963); United States v. Coggins, 986 F.2d 651, 653 (3d Cir.1993)).

<u>The Duration and Extension of the Traffic Stop</u>

"A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." Arizona v. Johnson, 129 S.Ct. 781, 788 (2009). Upon effectuating a traffic stop, an officer is permitted to ask for the driver's license and vehicle registration, and to run a criminal history check. United States v. Roberts, 77 Fed.Appx. 561, 562 (3d Cir. 2003) (officer "clearly entitled" to ask for "driver's license and vehicle registration and request[] a computer check on that information"); United States v. Mosley, 454 F.3d 249, 264 (3d Cir. 2006) (issuance of a citation and computer criminal history check are legitimate purposes of a stop). "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Johnson, 129 S.Ct. at 788 (citing Muehler v. Mena, 125 S.Ct. 1465, 1471 (2005)).

An officer can lawfully extend a traffic stop beyond the time necessary to issue a traffic citation, and detain the vehicle and its occupants for further investigation, where the officer develops a "reasonable, articulable suspicion of criminal activity." United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003) (citing United States v. Johnson, 285 F.3d 744, 749 (8th Cir. 2002)). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." Id. (citing Sokolow, 109 S.Ct. at 1585). In determining whether reasonable suspicion existed, the court must

11

look to the totality of the circumstances. Acts that may be innocent in isolation "or at least susceptible to an innocent interpretation, may collectively amount to reasonable suspicion." United States v. Del Valle, 323 Fed.Appx. 125, 128 (3d Cir. 2009) (citing United States v. Nelson, 284 F.3d 472, 480 (3d Cir. 2002) (quoting United States v. Arvizu, 122 S.Ct. 744, 751 (2002)). "The Supreme Court's most recent pronouncement on the Fourth Amendment reasonable suspicion standard accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." Givan, 320 F.3d at 458. Lastly, "the 'reasonable suspicion' analysis is objective; subjective motive or intent is not relevant for Terry purposes." United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006).

It is undisputed that Hope's stop of the SUV was proper as Frierson was driving at 76 mph in a 65 mph zone, in violation of the Pennsylvania Motor Vehicle Code, 75 Pa. C.S.A. §§ 3362(a)(1.1) and 6110(a). See United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997) ("It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations").

In effectuating the traffic stop, Hope was permitted to check Frierson's license, and Anderson's license, as he was the renter of the vehicle. Hope was also permitted to conduct a criminal history check, which revealed Frierson's extensive criminal history including homicide, drug trafficking and gun convictions. At that point, in addition to the criminal history, Hope had already made a number of observations which included that the two men were driving an out-of-state rental SUV; the driver's hands were in the 10-and-2 position, and he did not look at the trooper; there were three phones in the SUV's center console; Anderson volunteered that his girlfriend was a

Philadelphia police officer, which constituted a "disclaimer aimed at deflecting attention away from criminal activity;" and the men were from California.

Noting the Supreme Court's mandate to grant great deference to the officer's knowledge and experience, and having found Hope's testimony credible, we conclude that when viewed collectively, these factors created reasonable suspicion of criminal activity sufficient to justify "expand[ing] the scope of an inquiry beyond the reason for the stop and detain[ing] the vehicle and its occupants for further investigation."[6] See United States v. Lopez, 304 Fed.Appx. 82 (3d. Cir. 2008)(confirming the District Court's ruling that the officer had the reasonable suspicion necessary to expand the scope of an inquiry where the officer pointed to factors he believed to be unusual in the trucking industry and/or consistent with the transportation of illegal drugs).

Hope continued his investigation by contacting EPIC, and learned that Frierson had crossed into Mexico, a source country for illegal drugs entering the United States, four times in 2009. Additionally, because the rental agreement was expired and Frierson's name was not on the agreement, Straniere contacted the rental agency to determine the status of the rental. He learned the agreement had been extended and that Frierson was not authorized to drive the SUV. Straniere

---

[6] In making this determination, we have carefully considered that at 11:02 a.m. Hope stated on a phone call to an unknown person: "I'm going to have to get more reasonable suspicion." Frierson contends that "Hope could not (by his own admission) establish reasonable suspicion (and by law probable cause) that either defendant was engaging in criminal conduct, or was armed and dangerous." However, based on the record before us, it is unclear as to whether Hope was discussing whether he believed there was reasonable suspicion to extend the traffic stop, to search the car or to pat down an occupant of the car. Additionally, it is unclear what Hope meant when he stated he wanted "more" reasonable suspicion. In any event, Hope's state of mind is not the appropriate inquiry in that the "subjective motive or intent is not relevant for Terry purposes," rather the "'reasonable suspicion' analysis is objective." Goodrich, 450 F.3d at 559. The proper inquiry is whether an objective officer, having observed the above enumerated factors, would have reasonable suspicion to extend the traffic stop. We find that this test has been met.

also learned that Anderson had rented five vehicles in the previous four months. Hope testified that drug traffickers often rented multiple vehicles to transport drugs.

All of these factors combined to create reasonable suspicion that criminal activity - specifically drug trafficking - was underway when the two officers approached the SUV at 11:23 a.m., and Hope asked Frierson to exit the vehicle. Therefore, we find the traffic stop and its extension were lawful.

### The Troopers Had Reasonable Suspicion To Believe That Firerson Was Armed And Dangerous

An officer may frisk a person whom he has ordered out of a vehicle if he has a reasonable suspicion that the person is armed. United States v. Thach, 411 Fed.Appx. 485, 489 (3d Cir. 2011) (citing Pennsylvania v. Mimms, 98 S.Ct. 330, 333-34 (1977) (per curiam)). A finding of reasonable suspicion requires that the officer be able to "point to specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 88 S.Ct. at 1880 The purpose of a Terry frisk for weapons "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." United States v. Gatlin, 613 F.3d 374, 378 (3d Cir. 2010) (citing Adams v. Williams, 92 S.Ct. 1921, 1923 (1972). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 88 S.Ct. at 1883. The stop and the search are independent actions, and each requires its own justification. Gatlin, 613 F.3d at 378 (citing Johnson, 129 S.Ct. at 784) ("First, the investigatory stop must be lawful.... Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous").

We conclude that the troopers had reasonable suspicion to believe that Frierson was armed and dangerous. The Third Circuit has held that a safety frisk of an individual may be appropriate when a police officer suspects that person is engaged in drug trafficking, as drug traffickers often carry weapons. United States v. Sanchez, 398 Fed.Appx. 840, 843 (3d Cir. 2010) ("Given that drug traffickers often carry weapons and reasonable suspicion existed that the Appellants were drug dealers, the troopers reasonably suspected that both Appellants were armed and dangerous, justifying the minimally invasive search") (citing United States v. Binion, 570 F.3d 1034, 1039 (8th Cir. 2009) ("[A]n officer's reasonable belief that someone is involved in drug dealing can support a suspicion that the person is armed since weapons are often present incident to the drug business").

Here, we place particular weight on Frierson's criminal history, which included significant prior violent acts. This record reasonably made Hope fear for his and Straniere's safety. Further, the troopers had reasonable suspicion that Defendants were trafficking drugs and as an extension of that activity, that Frierson was armed and dangerous. Thus, we conclude that Hope's reasonable suspicion that Frierson was engaged in drug trafficking, coupled with his violent criminal history, justified Hope's belief that Frierson was likely armed and dangerous.

<u>Scope Of The Terry Frisk</u>

Frierson argues that even if the frisk was valid, the firearm is still inadmissible because Straniere had lifted his shirt prior to the frisk, thereby exceeding the scope of a Terry frisk. Terry, 88 S.Ct. 1868, allows a limited pat down of "the outer clothing" of the suspect. As indicated previously, although Straniere's police report could be read to reflect that Frierson's shirt was lifted before the frisk, we conclude that Straniere's testimony that he lifted Frierson's shirt only after he felt the gun to be credible. Thus, the frisk complied with Terry.

<u>The Search Of The Vehicle Was Permissible And Reasonable Under The Fourth Amendment</u>

Defendants next argue that Anderson was arrested and detained without probable cause and therefore the statements he made during his detention and the evidence seized as a result of his consent to search the SUV should be suppressed. The Government concedes that Anderson was illegally detained, and has indicated that it does not intend to rely on Anderson's consent to search the vehicle as the legal basis for that search, nor will it seek to introduce any of the statements made by Anderson.[7]  Thus, because the statements will not be introduced and the consent will not be relied upon, we need not address the legality of Anderson's detention or consent.

The Government argues the troopers had probable cause to arrest Frierson because he was a felon in possession of a firearm and that based on this arrest, the search was permissible under <u>Arizona v. Gant</u>, 129 S.Ct. 1710 (2009).  In <u>Gant</u>, the Supreme Court held that: "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." <u>Id.</u> at 1723.  The Court explained that in some cases "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." <u>Id.</u> at 1719.

The search of the vehicle in <u>Gant</u> was ultimately found to be unlawful because the Defendant was arrested for a traffic offense and thus "police could not expect to find evidence in the passenger

---

[7] The Government has reserved its right to present the statements if the Defendant should "open the door" to their admission. See <u>Walder v. United States</u>, 74 S.Ct. 354, 356 (1954) (evidence obtained in violation of fourth amendment admissible to impeach defendant's testimony); <u>Harris v. New York</u>, 91 S.Ct. 643, 644-45 (1971) (statement obtained in violation of Miranda admissible to impeach defendant's testimony, provided statement is otherwise trustworthy).

compartment of Gant's car." Id.  Here, unlike Gant, Frierson, a convicted felon, with a record that included homicide, and drug and gun offenses, was arrested for possession of a firearm.   We conclude that under those circumstances it was reasonable to believe that the SUV would contain evidence of the offense of arrest - including ammunition, documents relating to the firearm, or another firearm.  Therefore, the search of the SUV was permissible under Gant. See also, Thorton v. United States, 124 S.Ct. 2127, 2132 (2004)("Once an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment.")

We note that, unlike the situation presented in Gant where the vehicle was searched on the side of the road, here, the SUV was towed to police barracks prior to it being searched.  However, this difference is of no moment as the search of the vehicle need not be contemporaneous to its lawful seizure.  United States v. Mitan, 2009 WL 2195321 at * 13 (July 23, 2009) (citing United States v. Johns, 105 S.Ct. 881, 885 (1985) (quoting Michigan v. Thomas, 102 S.Ct. 3079, 3081(1982) (per curiam)("[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized.")).

We also find that it was lawful to search the bag found in the SUV.  The Government states that the troopers could "search the bag in the trunk of the vehicle."  However, an SUV does not have a discrete trunk area, rather, as Hope testified, the bag was found in the rear storage compartment of the vehicle. (Supp. Hr'g Tr. 87.)  The First Circuit Court of Appeals has held that where the entire interior of a vehicle is reachable without exiting the vehicle, such as is the case with hatch-back cars and SUVs with rear storage areas, the entire interior is considered part of the "passenger compartment."  United States v. Allen, 469 F.3d 11, 15 (1st Cir. 2006) (citing United States v.

17

Olguin-Rivera, 168 F.3d 1203, 1205-07 (10th Cir.1999) (covered cargo area of an SUV); United States v. Henning, 906 F.2d 1392, 1396 (10th Cir. 1990), cert. denied, 111 S.Ct. 789 (1991) ("Where . . . the vehicle contains no trunk, the entire inside of the vehicle constitutes the passenger compartment and may be lawfully searched"). Therefore, where an officer may legally search the "passenger compartment," his search can include the rear storage area of an SUV. Because the troopers were authorized to search the "passenger compartment" and "any containers therein," their search of the bag found in the rear storage area was also lawful.[8]

### III. CONCLUSION

For the reasons set forth above, I find the stop, frisk and search were lawful. Thus, the motions to dismiss are denied.

---

[8] In State Court, Judge Nagle found that Anderson was illegally detained and therefore his consent to search the vehicle was invalid. We note that Judge Nagle also determined that the arrest of Frierson as a felon in possession of a firearm would have provided sufficient probable cause for the troopers to have obtained a search warrant of the vehicle. As noted above, under federal law, an officer may search a vehicle incident to a recent occupant's arrest, without obtaining a warrant, if it is reasonable to believe the vehicle contains evidence of the offense of arrest. Gant, 129 S.Ct. at 1719.